UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CURIACO VALENCIA,

    Petitioner,

vs.

D. L. RUNNELS, Warden,

    Respondent.

                                        /

No. C 05-4423 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

A San Mateo County jury convicted petitioner of first degree murder with special circumstances. He was sentenced to prison for life without the possibility of parole. Petitioner unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme Court of California denied review.

The following facts are taken from the opinion of the California Court of Appeal:

> Defendant, a citizen of Mexico, was charged in an information filed April 21, 1999, with one count of first degree murder with five separate special circumstances (Pen.Code, § 187, subd. (a)) and one count of vehicle theft. (Veh.Code, § 10851, subd. (a).) The special circumstances alleged that the murder was committed in the course of burglary, robbery, kidnapping, rape, and sodomy. (Pen.Code, § 190.2, subd. (a)(17).)
>
> Defendant had been fired from a cleaning service. On the morning of March 2, 1998, the van operated by the cleaning service was stolen. After a neighbor told

the owner of the cleaning service that she had seen defendant lurking nearby, the owner spent the rest of the day unsuccessfully searching for defendant.

One of the homes defendant had cleaned during his time with the cleaning service was that of Sharon Leuenberger, a resident of Hillsborough. Late in the afternoon of March 2, Mrs. Leuenberger's mother visited the Leuenbergers' home because the mother had been unable to reach her daughter by telephone. Mrs. Leuenberger's mother found signs of disturbance in the home and called the police.

Late that day, defendant learned that he was being sought by the owner of the van. He left early the next morning by bus for Los Angeles, subsequently crossing into Tijuana and taking a plane to his hometown in Mexico.

The next morning, the cleaning service van was found abandoned in San Francisco. Mrs. Leuenberger's body was inside, wrapped in a sheet. Her hands were bound with duct tape, and duct tape was tightly wound around her entire face. Residual semen and a pattern of bruises indicated that she had been raped and sodomized. An autopsy determined that she had died of suffocation from the duct tape wrapped around her head.

Police eventually located defendant in Mexico and contacted him by telephone. The police investigator told defendant that he was wanted in connection with the theft of the van, that a body had been found in the van, and that the investigator hoped defendant could help with the homicide investigation. Defendant insisted he had nothing to do with the theft and said he was willing to return to the United States to clear things up. It was agreed that defendant would meet the police investigators in Tijuana for escort back to the United States for questioning. Defendant notified family members of his plans. An uncle in the United States, prior to the arrival of the American police investigators in Mexico, consulted with the Mexican Consul General's office in Los Angeles for advice.

The American police investigators met defendant at the Tijuana airport, as arranged. Also at the airport were members of the Mexican Federal Judicial Police, whose presence was arranged by the Mexican consul in the United States. Defendant, the Mexican police, and the American investigators traveled from the airport to Tijuana police headquarters, where the Mexican federal prosecutors questioned both the American investigators and defendant. After defendant confirmed that he was planning to return to the Bay Area with the officers, he spent approximately an hour in private conversation with the Mexican police, who told the American investigators that the purpose of the conversation was to inform defendant of his rights and discuss his options. After that discussion, defendant continued to be willing to leave the country voluntarily, despite being informed that a warrant had been issued for his arrest for vehicle theft and that a homicide investigation was under way. Defendant left for the United States in the company of the American investigators.

When the group arrived in San Diego, one of the American investigators called a legal attaché representing the Attorney General of Mexico in Los Angeles, informing the attaché that defendant had returned to the United States. The legal attaché said that he was already aware that defendant was returning.

Defendant was flown to San Francisco. After the police investigators took oral tissue samples, hair samples, and finger-and thumbprints from defendant pursuant to a search warrant, they allowed defendant to rest for the evening. The

next day defendant was informed of his Miranda rights and questioned about the theft and murder. Following six hours of discussion, defendant made a taped statement. After speaking with one of his uncles by telephone, defendant then asked to consult a lawyer, ending the investigators' interview. At that point, defendant was arrested for Mrs. Leuenberger's death, and the police obtained pubic hair samples from him. Two days later, defendant met in jail with an official from the Mexican consulate.

It was eventually learned that the DNA in the tissue samples taken from defendant matched the DNA in the blood and sperm samples taken from Mrs. Leuenberger's body, and defendant's fingerprints matched those found on the van and on several items associated with the body in the van, including a juice container of a type found in the Leuenbergers' home. Defendant was convicted of both murder and vehicle theft, and the jury found all of the special circumstances allegations to be true. Because the district attorney elected not to seek the death penalty, defendant was sentenced to life without possibility of parole and a consecutive term of three years for vehicle theft.

Ex. C4 at 1-4.[1]

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application

---

[1] Citations to "Ex." are to the exhibits in the record lodged by respondent.

3

of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

## DISCUSSION

As grounds for federal habeas relief, petitioner asserts that: (1) His Vienna Convention right to be notified of his right to contact the Mexican consul was violated; (2) his due process rights were violated when the trial court gave inadequate jury instructions; and (3) the sentencing judge committed misconduct by inappropriate comments regarding petitioner's immigration status.

**I.     Vienna Convention**

The Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77 ("the Convention"), is a treaty made under the authority of the United States and therefore the supreme law of the land. *United States v. Lombera-Camorlinga*, 206 F.3d 882, 884 (9th Cir. 2000) (en banc) (citing U.S. Const. art. VI, cl. 2). The Ninth Circuit has not decided if section 36(1)(b) of the Convention, which provides foreign nationals who are arrested in the United States the right to an advisement of their right to contact their

4

consulates, creates individually enforceable rights. *Id.* at 884, 885. However, the International Court of Justice has determined that the Vienna Convention indeed provides individually enforceable rights, that the United States must provide review of cases involving violations of the convention's consular rights to determine if the violations caused actual prejudice, and that procedural default rules may not be allowed to bar such review. *Medellin v. Dretke*, 544 U.S. 660, 667-69 (2005) (per curium) (citing *Case Concerning Avena and other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. No. 128 (Judgment of Mar. 31)) (dismissing writ of certiorari as improvidently granted in light of *Avena*, petitioner's pending state court proceeding, and president's memorandum that United States would comply with its obligations under convention and ICJ decision by "having" state courts give effect to ICJ's decision).

Petitioner contends that because of the admitted failure to comply with section 36(1)(b) of the Vienna Convention, the trial court should have suppressed his post-arrest statements and the results of tests of the physical evidence taken from him. As hinted above, this undoubtedly is an area of the law where change is afoot. At the moment, however, there is no United States Supreme Court authority holding that a violation of the Vienna Convention requires suppression of evidence, *see Lombera-Camorlinga*, 206 F.3d at 887 (noting lack of Supreme Court guidance regarding appropriateness of using exclusionary rule to enforce Vienna Convention), and the Supreme Court has declined to consider a number of other issues. *See Medellin, 544* U.S. at 664-666 (describing questions unresolved at the Supreme Court level before habeas relief could be granted on a Vienna Convention claim). As a result, the state courts' holdings rejecting this claim cannot be contrary to, or an unreasonable application of, clearly-established United States Supreme Court authority.

**II.     Jury Instructions**

Petitioner contends that the trial court violated his due process rights by giving an erroneous jury instruction.

///

### A. Background

The court of appeal explained the claim:

> Defendant next contends that the trial court improperly instructed the jury on the legal standard for attempted rape and sodomy in connection with the special circumstances allegations. Defendant concedes that the trial court properly instructed the jury that a murder committed in the course of attempted rape and sodomy could support a finding of special circumstances, that the underlying crimes of rape and sodomy could only be committed on a live victim, and that intent to rape or sodomize a dead person could not support either attempt or the underlying crimes. However, defendant objects to the court's general instruction on attempted rape and sodomy, the relevant portion of which stated, "The crime of attempted [rape]/[sodomy], however, does not require that the victim was alive at the time of the sexual penetration. Instead, it is only necessary that at the time the defendant formed the intent to [rape]/ [sodomize] [the victim], he reasonably believed that the victim was alive." (Italics added.) Defendant contends that this instruction improperly stated the law because a defendant's belief that the victim is alive must continue past the formation of intent until the rape attempt is actually made-that is, until the time the defendant takes some direct act toward commission of rape or sodomy.
>
> The state does not appear to disagree with defendant's fundamental point of law-that a perpetrator's intent to sexually assault a living person must persist to the time of the direct act toward accomplishing an act of rape or sodomy in order for an attempt to occur. Nor do we. The crime of "attempt" includes both the formation of a specific intent and the accomplishment of some direct but ineffectual act toward the commission of the underlying crime. (Pen.Code, § 21a; People v. Williams (2001) 26 Cal.4th 779, 789.) Because an essential element of the crimes of rape and sodomy is that they occur against the will of the victim, they require a living victim. (People v. Kelly (1992) 1 Cal.4th 495, 524.) Attempted rape and sodomy can occur upon a dead body, however, if the defendant mistakenly believes the victim to be alive at the time of the attempt. ( People v. Hart (1999) 20 Cal.4th 546, 611.) In order to maintain the requisite specific intent throughout the commission of the crime of attempt, the defendant's belief that the victim is alive must persist through at least the commencement of the direct act toward rape or sodomy.

Ex. C4 at 6-7.

The court of appeal thus held that state law requires that for an attempt to have occurred the "perpetrator's intent to sexually assault a living person must persist to the time of the direct act toward accomplishing an act of rape or sodomy." *Id.* That holding is binding on this court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus). The court went on to note that under California law the "cardinal rule" is that the instructions are to be read as whole. Ex. C4 at 8. It quoted the entire instruction (as it noted, the sodomy instruction was parallel):

> The crime of attempted rape, however, does not require ... that the victim was alive at the time of the sexual penetration. Instead, it is only necessary that at the time the defendant formed the intent to rape, he reasonably believed that the victim was alive .[¶] Accordingly, in order to prove the crime of attempted rape, the following elements must be proved: [¶] 1. The defendant formed the intent to commit rape; and [¶] 2. The defendant reasonably believed the victim was alive at the time he formed that intent; and [¶] 3. The defendant committed a direct but ineffectual act toward the commission of rape. [¶] If you find that the defendant intended at all times to have sexual intercourse with the dead body, he has .... committed neither rape nor attempted rape and he cannot be found guilty of first degree murder on a felony murder theory nor can you find the special circumstance of murder during the commission of rape to be true.

*Id.*

The court then held that "any error by the jury was prevented by the court's final sentence, which instructed that the intent to have sexual intercourse with a dead body is inconsistent with attempted rape." *Id.* at 8. Alternatively, the court held that "[i]n light of the substantial and essentially uncontested evidence that [the victim] was bruised resisting sexual assault while alive, any error in the trial court's instructions with respect to the requisite intent at the time of the initial act toward accomplishing rape or sodomy was harmless beyond a reasonable doubt." *Id.* at 9-10.

In short, the court implied that one sentence of the instruction, "it is only necessary that at the time the defendant formed the intent to rape, he reasonably believed that the victim was alive," is erroneous under state law, because it is also necessary under California law that the intent to have intercourse with a living person exist at the time the first step is taken in the attempt. *Id.* at 9. But the instruction taken as a whole would prevent the error from affecting the jury because if by the time of the direct act "the defendant realized his victim was dead, . . . his intent would necessarily have changed from the intent to have intercourse with a living person to the intent to have intercourse with a dead body." *Id.* at 9. In that case the last sentence of the instruction would prevent the jury from finding the special circumstance of attempted rape or sodomy. *Id.*

**B.   Standard**

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141,

7

147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at 72.

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S. at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990).  Even if there is some ambiguity or inconsistency in the instruction, such error is not necessarily a due process violation unless the defendant can show both ambiguity and a "reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element" beyond a reasonable doubt."  *Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009) (internal quotations and citations omitted.).  A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred, however.  *Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  *See Calderon*, 525 U.S. at 146-47.

**C.     Analysis**

This is a difficult and obscure point, and not free from doubt, but it appears to the court that the last sentence of the instruction would apply – that is, prevent the jury from finding attempted rape – only if "at all times" petitioner intended to have intercourse with a dead body; that is, it says nothing about the hypothetical situation in which the perpetrator formed the intent to have intercourse while the victim was still alive, but took the first active step towards intercourse after the victim had died.

Although the last sentence appears to the court not to remedy the error as the court of appeal held, the instruction is nothing if not ambiguous. *See Mejia v. Garcia*, 534 F.3d 1036, 1045 (9th Cir. 2008) (finding an instruction ambiguous where "reasonable minds can differ in their reading" ). Thus the issue here is whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & n. It is undisputed that there was strong evidence in the form of bruising that the victim was assaulted while still alive, and no evidence to the contrary. Ex. C4 at 9. Under these circumstances there was not a "reasonable likelihood" that the jury would apply the instruction in a way that violates the Constitution. There thus was no constitutional violation, and for that reason and because of the ambiguity of the instruction, the state courts' rejections of this claim were not unreasonable. And because of the unrebutted and compelling evidence that the victim was alive when sexually assaulted, the instructional error, if there was one, did not have a substantial and injurious effect or influence in determining the jury's verdict and so was not prejudicial. See *Brecht*, 507 U.S. at 637. Petitioner is not entitled to habeas relief on this claim.

### III.    Immigration Status

Petitioner contends that the sentencing judge was biased against him because he is an immigrant. Respondent not only denies the claim but also contends that it is procedurally defaulted.

#### A.    Background

The court of appeal set out the background of this claim:

> Defendant's final contention is that a comment of the trial judge in explaining his reasons for imposing sentence revealed intolerable bias against foreign nationals such as defendant.
>
> At the sentencing hearing, the trial judge initially noted the kindness Mrs. Leuenberger had shown to defendant when he first cleaned her house. The judge continued: "She was a benevolent, trusting lady, yet, she was repaid by such viciousness I can't even begin to comprehend. [¶] This case disturbs me because it again demonstrates that as our borders remain seemingly wide open, every trusting American must close and double-latch their doors." The judge then discussed the severe impact of the victim's death upon her family, an impact vividly described in letters sent to the court and personal statements made at the sentencing hearing, and expressed his dismay that

the state had elected not to pursue the death penalty. He concluded by saying, before formally pronouncing sentence, "Let it be known that this sentence is the maximum sentence. And sir, you will die in prison." It is the court's reference to "wide open" borders that defendant contends betrays a prejudice against foreign nationals. Ex. C4 at 10-11.

The court of appeal concluded that the claim was not preserved because petitioner did not object at the time, and that even if it had been preserved, petitioner had not shown bias or prejudice. *Id.* at 10-11.

**B.  Analysis**

It is undisputed that petitioner did not object to the judge's alleged bias at the time of his comment. California's contemporaneous objection rule, which provides that objections are waived if not made at the earliest practicable time, is recognized by the Ninth Circuit as a valid procedural bar. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999). This claim therefore is barred.

Alternatively, the court will consider petitioner's claim on the merits.

A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted). A state judge's conduct must be significantly adverse to a defendant before it violates constitutional requirements of due process and warrants federal intervention. *See Garcia v. Warden, Dannemora Correctional Facility*, 795 F.2d 5, 8 (2d Cir. 1986). It is not enough that a federal court not approve of a state judge's conduct. Objectionable as the conduct at issue might be, when considered in the context of the trial as a whole it may not be of sufficient gravity to warrant the conclusion that fundamental fairness was denied. *See Duckett*, 67 F.3d at 741 (citations omitted).

///

10

It is clear that the sentencing judge's single comment here, unsupported by even a single instance of bias at trial, Ex. C4 at 10, was neither significantly adverse to petitioner nor did it render the trial fundamentally unfair. Petitioner's due process rights were not violated at sentencing.

Finally, petitioner was not prejudiced. The court of appeal held that under California law there are only two sentences available for first degree murder with special circumstances, life without parole or death. Ex. C4 at 11. Because the prosecution did not pursue the death penalty, the only possible sentence in this particular case was life without parole, which of course was the sentence imposed. Thus, even it bias is assumed, petitioner could not have been prejudiced. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated:  March 30, 2009.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.05\valencia432.deny habeas.wpd